**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Raymond JENNINGS, Defendant–**
**Appellant.**

**No. 01–4927.**

United States Court of Appeals,
Fourth Circuit.

Argued: Sept. 26, 2002.

Decided: March 19, 2003.

**ARGUED:** John Herman Hare, Assistant Federal Public Defender, Columbia, South Carolina, for Appellant. Stacey Denise Haynes, Assistant United States Attorney, Columbia, South Carolina, for Appellee. **ON BRIEF:** J. Strom Thurmond, Jr., United States Attorney, Columbia, South Carolina, for Appellee.

Before WILKINSON and WIDENER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge HAMILTON wrote the majority opinion, in which Judge WILKINSON joined. Judge WIDENER wrote a dissenting opinion.

**OPINION**

HAMILTON, Senior Circuit Judge.

Raymond Henry Jennings (Jennings) appeals from a judgment entered by the district court following his conditional guilty plea and sentencing for violating 18 U.S.C. § 922(g)(9). On appeal, Jennings makes several arguments, all of which attack the district court's refusal to dismiss the indictment returned by the grand jury. For the reasons set forth below, we affirm.

I

A

In 1996, Congress amended the Gun Control Act of 1968, *id.* § 922, by providing that a person convicted of a misdemeanor crime of domestic violence (MCDV) is prohibited from, *inter alia,* possessing a firearm or ammunition. *Id.* § 922(g)(9). A MCDV is defined as an offense that is a "misdemeanor under Federal or State law," *id.* § 921(a)(33)(A)(i), and

has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting or

has cohabitated with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

*Id.* § 921(a)(33)(A)(ii). Under the statutory scheme, however, a person shall not be considered to have been convicted of a MCDV offense unless, among other things: (1) the person "knowingly and intelligently waived the right to counsel" in the MCDV case, *id.* § 921(a)(33)(B)(i)(I); (2) the person, if he was entitled to a jury trial in the MCDV case under the laws of the jurisdiction in which the MCDV case was "tried," *id.* § 921(a)(33)(B)(i)(II), "knowingly and intelligently waived the right to have the [MCDV] case tried by a jury, by guilty plea or otherwise," *id.* § 921(a)(33)(B)(i)(II)(bb); and (3) the person, with regard to the MCDV offense, did not have his civil rights "restored," *id.* § 921(a)(33)(B)(ii).

## B

In March 1997, following a bench trial, Jennings was convicted of criminal domestic violence (CDV) in Sumter, South Carolina Municipal Court. For this misdemeanor offense, he received a suspended sentence of thirty days. Jennings does not dispute that his March 1997 CDV offense meets the definition of a MCDV set forth in 18 U.S.C. §§ 921(a)(33)(A)(i) and (ii). However, because Jennings was not incarcerated for his March 1997 CDV conviction, the parties agree that Jennings lost none of his civil rights under South Carolina law. *Cf.* S.C. Ann.Code § 7–5–120(B)(2) (noting that a person is disqualified from being registered to vote or voting if he "is serving a term of imprisonment resulting from a conviction of a crime"). The parties also agree that, had Jennings been incarcerated for the March 1997 CDV conviction, his civil right to vote would have been completely restored upon his release from incarceration.

On December 2, 1999, Jennings possessed a firearm, namely, "a Dreyse, 7.65 mm pistol," and ammunition, in the form of "12 gauge shotgun shells and .410 shotgun shells." (J.A. 11). In June 2000, a federal grand jury sitting in the District of South Carolina returned a one-count indictment charging Jennings with a violation of 18 U.S.C. § 922(g)(9).

Following the grand jury's indictment, Jennings moved to dismiss the indictment on August 22, 2000 on the ground that, with regard to his March 1997 conviction for CDV, his civil rights, even though they had never been taken away, had been "restored" within the meaning of 18 U.S.C. § 921(a)(33)(B)(ii), and, therefore, he could not be subject to prosecution for an 18 U.S.C. § 922(g)(9) violation. On October 11, 2000, the district court held a hearing on the motion, at which Jennings' motion to dismiss the indictment was denied.

Near the conclusion of the October 11, 2000 hearing before the district court and following the district court's denial of his motion to dismiss the indictment, Jennings suggested to the district court that he could not be prosecuted under 18 U.S.C. § 922(g)(9) because, with regard to his March 1997 CDV conviction, he did not knowingly and intelligently waive his right to counsel as required by 18 U.S.C. § 921(a)(33)(B)(i)(I). The district court allowed Jennings to make an oral motion along this line and Jennings filed a written motion to dismiss the indictment on October 13, 2000.

On this second motion to dismiss, the district court held a hearing on November 29, 2000. At the hearing, Sumter Municipal Court Judge Mary Herbert (Judge Herbert) testified that she had no specific recollection of Jennings' case and, thus, could not recall the circumstances surrounding Jennings' waiver of his right to

counsel and waiver of his right to a jury trial in the March 1997 CDV case. However, Judge Herbert described the procedure that she routinely employed, in her twenty-one years as a municipal court judge, to secure a defendant's waiver of his right to counsel and his right to a jury trial. Jennings also testified at the November 29, 2000 hearing. Although he did not remember much of what happened before Judge Herbert, Jennings acknowledged that Judge Herbert advised him of his right to a jury trial and that, if he opted for a jury trial, he would have the opportunity to pick a jury and have a jury trial. According to Jennings, he decided to forego a jury trial and opt for a bench trial because he "just wanted to get out [of the courtroom] and get back to work." (J.A. 119).[1]

On December 1, 2000, Jennings filed a memorandum in which he raised another ground to dismiss the indictment. In the memorandum, Jennings argued that he could not be prosecuted under 18 U.S.C. § 922(g)(9) because, with regard to his March 1997 CDV conviction, he did not knowingly and intelligently waive his right to a jury trial as required by 18 U.S.C. § 921(a)(33)(B)(i)(I)(bb).

On December 15, 2000, the district court rejected Jennings' remaining attacks to the validity of the indictment. Following the district court's ruling, Jennings entered a conditional guilty plea to the 18 U.S.C. § 922(g)(9) violation, reserving his right to appeal the district court's rejection of his attacks on the indictment.

On April 24, 2001, Jennings filed a motion for reconsideration, which was denied by the district court. On November 14, 2001, Jennings was sentenced to fifteen months' imprisonment, but he remains free on bond pending this timely appeal.

## II

The first and principal issue raised in this appeal is whether a person convicted of a MCDV but never stripped of his civil rights under state law is thereafter subject to prosecution under 18 U.S.C. § 922(g)(9). According to Jennings, he could not be convicted of violating 18 U.S.C. § 922(g)(9) because, with regard to his March 1997 conviction for CDV, his civil rights, even though they had never been taken away, were nevertheless "restored" under 18 U.S.C. § 921(a)(33)(B)(ii).

 Our examination of issues involving statutory interpretation begins with an analysis of the language of the statute. *Holland v. Big River Minerals Corp.,* 181 F.3d 597, 603 (4th Cir.1999), *cert. denied,* 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000). In analyzing the meaning of a statute, we must first "determine whether the language at issue has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Our determination of ambiguity is guided "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341, 117 S.Ct. 843. "[T]he sole function of the courts is to enforce [the statute] according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). Consequently, we cannot go beyond the plain meaning of the statute unless there is "a clearly expressed legislative intent to the contrary," *Russello v. United States,* 464 U.S. 16, 20, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (internal quotation marks omitted),

---

1. The record reflects that Jennings had, as of March 1997, an extensive criminal record, which included, among other convictions, two convictions for CDV in Sumter Municipal Court and one conviction for CDV in Sumter County, South Carolina Magistrate's Court.

a literal application of the statute would thwart its obvious purpose, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), or a literal application of the statute would produce an absurd result, *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

Under 18 U.S.C. § 921(a)(33)(B)(ii), a person shall not be considered to have been convicted of a MCDV

> if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess or receive firearms.

*Id.* § 921(a)(33)(B)(ii).[2]

■ Jennings conceded at oral argument that his plain language argument is weak. This concession was wise, as it is obvious that Jennings' civil rights were never taken away and, thus, were never "restored." As the court noted in *McGrath v. United States*, 60 F.3d 1005 (2d Cir.1995), the "word 'restore' means 'to give back (as something lost or taken away).'" *Id.* at 1007 (quoting *Webster's Third New International Dictionary* 1936 (1976)). And, the "'restoration' of a thing never lost or diminished is a definitional impossibility." *McGrath*, 60 F.3d at 1007. Because Jennings' civil rights were never taken away, it is impossible for those civil rights to have been "restored."

Jennings' argument boils down to the assertion that the literal application of the word "restored" produces an absurd re-

sult. According to Jennings, it is absurd to treat those misdemeanants who never lost their civil rights more harshly than those misdemeanants who temporarily lost their civil rights while incarcerated and had them restored upon release from incarceration. Jennings' position is not without support.

In *United States v. Indelicato*, 97 F.3d 627 (1st Cir.1996), the defendant pleaded guilty in Massachusetts state court to assault and battery with a knife and carrying a dangerous weapon (the knife). *Id.* at 628. The state court ultimately sentenced the defendant to a one-year suspended sentence and $7,500 in restitution, which the defendant paid. *Id.* Both offenses were misdemeanors under Massachusetts state law but punishable by a maximum sentence of two and one-half years' imprisonment. *Id.*

Thereafter, the defendant possessed firearms and ammunition and was indicted for violating 18 U.S.C. § 922(g)(1), the felon-in possession statute. Because his state crimes carried a maximum sentence of more than two years, the defendant did not fall within the exception of 18 U.S.C. § 921(a)(20)(B), which excludes from 18 U.S.C. § 922(g)(1)'s purview persons convicted of state misdemeanors punishable by a term of imprisonment of two years or less. In the district court, the defendant argued that 18 U.S.C. § 921(a)(20) applied to him because Massachusetts never took away his civil rights and because he suffered no restrictions on his state firearms privileges. The district court rejected this argument, and, following his conviction in a bench trial, the defendant appealed. *Indelicato*, 97 F.3d at 627–28.

---

**2.** This section is analogous to the felon-in-possession restoration of civil rights statute, 18 U.S.C. § 921(a)(20). Of note, 18 U.S.C. § 921(a)(20) does not contain the parenthetical phrase "(if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense)," which is contained in 18 U.S.C. § 921(a)(33)(B)(ii).

The issue, as framed by the *Indelicato* court, was whether the restoration exception of 18 U.S.C. § 921(a)(20) "protects one who, like Indelicato, never had his civil rights taken away at all." *Indelicato,* 97 F.3d at 629. The court acknowledged that "the ordinary reading of the word 'restored' supports the government," *id.,* but noted that there were two different reasons why the literal language of 18 U.S.C. § 921(a)(20) did not preclude further inquiry. *Indelicato,* 97 F.3d at 629. First, the court observed that "a ready explanation exists why Congress might have used the term 'restored' without intending to exclude persons like" the defendant. *Id.* According to the court, "there is no indication in the legislative history that Congress gave any attention to the rare case in which someone convicted of a serious crime would not lose one or more of the three civil rights that have been used by most courts as touchstones under this section." *Id.* Second, the court observed that "it is hard to find any reason why Congress would have wished to adopt the distinction now urged by the government." *Id.* Because, in the court's view, the language of 18 U.S.C. § 921(a)(20) was not conclusive, the court turned to the statute's legislative history and purpose. *Indelicato,* 97 F.3d at 629.

After conducting this inquiry, the court concluded that the purpose of the statutory scheme was to accommodate " 'a state's judgment that a particular person or class of persons is, despite a prior conviction, sufficiently trustworthy to possess firearms.' " *Id.* at 630 (quoting *McGrath,* 60 F.3d at 1009). Noting that the trustworthiness rationale did not require an individualized decision under its circuit precedent, the court concluded that, "it is hard to see why Congress would wish to distinguish between one whose civil rights were never taken away (Indelicato) and one whose civil rights were mechanically taken away and mechanically restored." *Indelicato,* 97 F.3d at 630. According to the court, drawing a distinction would "certainly create an anomalous result in various situations, such as a jurisdiction that did not deprive a misdemeanant of civil rights but took away the rights of a felon and then restored them by statute on the felon's completion of his prison term and period of supervision." *Id.* Consequently, the court concluded that the defendant's "civil rights, to the extent that they were never taken away, should be treated as 'restored' " for purposes of 18 U.S.C. § 921(a)(20).[3] *Indelicato,* 97 F.3d at 631.

Recently, the Sixth Circuit reached a decision consistent with the First Circuit's decision in *Indelicato.* In *United States v. Wegrzyn,* 305 F.3d 593 (6th Cir.2002), the defendant was charged with a violation of 18 U.S.C. § 922(g)(9). *Wegrzyn,* 305 F.3d at 594–95. The predicate MCDV was a Michigan charge of domestic violence, for which the defendant received a sentence of six to twelve months' probation. Because the defendant was not incarcerated, he lost none of his civil rights under Michigan law. *Id.* at 594–95. This district court held that the defendant could not be prosecuted under 18 U.S.C. § 922(g)(9) because

---

**3.** Several other decisions have criticized in *dicta* the result that persons convicted of serious crimes who temporarily lost their civil rights are immune from prosecution for firearm possession, while those convicted of lesser offenses—offenses that did not justify stripping them of their civil rights—remain subject to an 18 U.S.C. § 922(g)(1) prosecution. *See, e.g., United States v. Hall,* 20 F.3d 1066, 1069 (10th Cir.1994) (noting that, if Congress had intended this result, it "would (and easily could) have been more explicit"); *United States v. Thomas,* 991 F.2d 206, 212 (5th Cir.1993) (characterizing this result as "Wonderland").

misdemeanants convicted of domestic violence in Michigan who were *not* sentenced to periods of incarceration should also be able to possess firearms upon completion of their sentences of probation or other punishments. Otherwise, . . . the untenable situation would occur in which an individual who presumably committed a more egregious offense justifying incarceration would nevertheless be allowed—upon completion of the jail sentence—to possess a firearm, while another misdemeanant whose transgression did not merit such severe punishment would be treated more harshly at the conclusion of a more lenient punishment.

*Wegrzyn,* 305 F.3d at 595.

On appeal, the government contended that the district court's decision ignored the plain language of the controlling statutes and compelled an "absurd result." *Id.* at 595. The *Wegrzyn* court rejected these arguments, concluding that the district court's decision gave "effect to the exception crafted by Congress and to the peculiarities of Michigan criminal law." *Id.* at 595. According to the *Wegrzyn* court,

> [i]n enacting 18 U.S.C. § 921(a)(33)(B)(ii), Congress chose to allow the states themselves to dictate the parameters of the statutory exception by recognizing the differences among state laws concerned with loss of civil rights upon conviction for certain offenses. Consequently, the Michigan legislature itself, by choosing to strip even misdemeanants of a core civil right, created the problem now facing the frustrated federal prosecutors. Indeed, had Michigan lawmakers, like almost all other state legislatures throughout the country, chosen to treat individuals guilty of lesser crimes (misdemeanors) less severely than felons and not stripped

those individuals of their right to vote, the problem presented in this case by the later restoration of that right would never have arisen.

In short, it is the peculiar interplay between the relevant federal statutes, Michigan state legislation, and Sixth Circuit precedent that has resulted in a legal conclusion that here permits a statutory exception to swallow the intended rule. Although such a result may not be palatable to many, it is far from "absurd" because, besides being mandated by applicable law, it also gives effect to the Congressional intent to allow states to have input in the definition of the parameters of the crime, and gives effect to the expressed intent of the Michigan legislature. Ironically, the Michigan populace is now forced to sacrifice some of its collective security only because of the state legislature's decision to impose—in one aspect, at least—the same penalty to all persons convicted of offenses against the state, regardless of the seriousness of the charge.

*Wegrzyn,* 305 F.3d at 595–96 (footnote omitted).

Notwithstanding the decisions reached by the courts in *Indelicato* and *Wegrzyn,* we find four other circuit court decisions, *McGrath, United States v. Smith,* 171 F.3d 617 (8th Cir.1999), *United States v. Hancock,* 231 F.3d 557 (9th Cir.2000), *cert. denied,* 532 U.S. 989, 121 S.Ct. 1641, 149 L.Ed.2d 500 (2001), and *United States v. Barnes,* 295 F.3d 1354 (D.C.Cir.2002), more persuasive on the question of whether a literal application of the word "restored" to Jennings produces an absurd result.

In *McGrath,* the petitioner was convicted in 1961 in Vermont state court of larceny, a crime classified as a felony in that state. 60 F.3d at 1005. He was not sentenced to jail time, but was given a sus-

pended sentence of three to five years' imprisonment and placed on probation. *Id.* Under Vermont law, the petitioner did not lose any of his civil rights because he was not incarcerated, *id.*, and Vermont law provided no mechanism for felons who lost their civil rights to have them restored. *Id.* at 1008. Over thirty years later, in 1992, the petitioner was charged with, and pleaded guilty to, a violation of 18 U.S.C. § 922(g)(1). *McGrath*, 60 F.3d at 1005–06. The petitioner did not appeal, but later filed a 28 U.S.C. § 2555 motion, asserting that, because Vermont law had not stripped him of any civil rights as a result of his 1961 larceny conviction, he was not a person prohibited from carrying a firearm under 18 U.S.C. § 922(g)(1). *McGrath*, 60 F.3d at 1006. In an amended 28 U.S.C. § 2555 motion, the petitioner claimed that his counsel's failure to raise this claim at his plea, sentencing, or on direct appeal should be excused because he received ineffective assistance of counsel. *McGrath*, 60 F.3d at 1006. The district court dismissed the petitioner's petition, and the petitioner appealed. *Id.*

On appeal, the petitioner argued that the exemption for felons who have " 'had civil rights restored' should extend to felons whose civil rights were never taken away." *Id.* at 1007. The *McGrath* court rejected this argument. First, the court noted that the petitioner's argument was incompatible with the meaning of the word "restore." *Id.* (The " 'restoration' of a thing never lost or diminished is a definitional impossibility."). Second, the court observed that the petitioner's arguments to avoid the plain meaning of "restore" were unavailing. The court rejected the petitioner's argument that it was anomalous for the government to treat those persons who never lost their civil rights more harshly than those persons who temporarily did so because it ignored the apparent intention of the 1986 amendment

(Firearms Owners' Protection Act (FOPA)) to the Gun Control Act of 1968, which added the restoration exception of 18 U.S.C. § 921(a)(20):

> Prior to its passage, the felon-in-possession statute applied to all convicted felons, regardless whether the predicate conviction entailed deprivation of civil rights. Thus, from the first, the Gun Control Act failed to distinguish between those whose felony convictions resulted in loss of civil rights, and those who retained those rights notwithstanding the conviction. The FOPA amendment then exempted felons to whom the convicting jurisdiction extended a subsequent gesture of forgiveness, or partial forgiveness, by means of pardon, expungement, or restoration of civil rights. The theory was no doubt that such a subsequent forgiveness should be credited as an acknowledgement of rehabilitation or an affirmative gesture of goodwill that merited exemption from the firearms bar.

*McGrath*, 60 F.3d at 1007.

Next, the *McGrath* court rejected the petitioner's argument that Congress could not have intended exposure to prosecution to depend on the caprices of state legislatures. *Id.* at 1008. After noting that many states restore civil rights to convicted felons by means of a general law stating that all rights shall be reinstated upon the service of sentence, that other states authorize prison officials to issue a certificate of restoration to some or all felons after a certain period following the expiration of a prison sentence or parole, that a minority of states restore rights in piecemeal fashion: one provision in the state code may disable a felon's right to vote while incarcerated, while separate provisions suspend the right to hold office and to serve on a jury during imprisonment, and that at least twelve states—including Vermont—

appear to have no provisions whatsoever for the restoration of civil rights, the court observed that "this effect—if not the precise result—was exactly what Congress did intend." *Id.* at 1008–09. According to the *McGrath* court:

The exemption at issue was passed in 1986 in response to a 1983 Supreme Court decision which held that the definition of a predicate offense under the Gun Control Act of 1968 was a matter of federal, not state law. *Dickerson v. New Banner Inst., Inc.,* 460 U.S. 103, 111–12, 103 S.Ct. 986, 991–92, 74 L.Ed.2d 845 (1983). *Dickerson* held that a state's expungement of a conviction did not nullify the conviction for the purpose of applying the federal firearms statute. Section 921(a)(20) was expressly crafted to overrule Dickerson's federalization of a felon's status by allowing state law to define which crimes constitute a predicate offense under the statute, and thereby to determine which convicted persons should be subject to or exempt from federal prosecution for firearms possession. *See United States v. Jones,* 993 F.2d 1131, 1135 (4th Cir. 1993), *aff'd sub nom. Beecham v. United States,* 511 U.S. 368, [372–73], 114 S.Ct. 1669, 1672, 128 L.Ed.2d 383 (1994). Calling its new legislation the "Firearms Owners' Protection Act," Congress sought to accommodate a state's judgment that a particular person or class of persons is, despite a prior conviction, sufficiently trustworthy to possess firearms.

The very decision to have restoration triggered by events governed by state law insured anomalous results. The several states have considerably different laws governing pardon, expungement, and forfeiture and restoration of civil rights. Furthermore, states have drastically different policies as to when and under what circumstances such dis-

cretionary acts of grace should be extended. The anomaly McGrath complains of is but one of innumerable anomalies that § 921(a)(20) will produce. They are the inevitable consequence of making access to the exemption depend on the differing laws and policies of the several states.

*McGrath,* 60 F.3d at 1009.

The *McGrath* court also observed that the petitioner's position, while correcting one anomaly, would create another:

Under his proposal, the most dangerous felons in a state that elected not to forfeit civil rights would be exempted from the federal prohibition, while those convicted of far less serious crimes in other states would not be exempted unless they were lucky enough to receive the benefits of an act of grace.

*Id.* Finally, the *McGrath* court observed that the petitioner's position "undercut the basic federal policy of keeping firearms out of the hands of convicted felons." *Id.*

In *Smith,* the defendant pleaded guilty in 1994 to an Iowa state charge of misdemeanor assault. 171 F.3d at 619. This offense met the definition of a MCDV under 18 U.S.C. §§ 921(a)(33)(A)(i) and (ii). *Smith,* 171 F.3d at 621. None of the defendant's civil rights were stripped away because, under Iowa law, a misdemeanant does not lose his civil rights upon conviction even if he is incarcerated. *Id.* at 623. In 1996, the defendant possessed a firearm and was charged with violating 18 U.S.C. § 922(g)(9). *Smith,* 171 F.3d at 619. He conditionally pleaded guilty to the 18 U.S.C. § 922(g)(9) charge, and, on appeal, he argued that he should fit within the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii) because the end result was the same—he still possessed his civil rights, regardless of whether he had them

restored or he never lost them in the first place. *Smith,* 171 F.3d at 619, 623.

In rejecting the defendant's argument, the court distinguished *Indelicato* on the basis that it involved 18 U.S.C. § 921(a)(20) and not 18 U.S.C. § 921(a)(33)(B)(ii). *Smith,* 171 F.3d at 623. According to the court, 18 U.S.C. § 921(a)(33)(B)(ii)'s parenthetical language "(if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense)," which is not contained in 18 U.S.C. § 921(a)(20), precluded the application of *Indelicato. Smith,* 171 F.3d at 623. In other words, because Iowa law did not provide for the loss of civil rights for a misdemeanant, the defendant could not fall within the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii). *Smith,* 171 F.3d at 623; *cf. United States v. Keeney,* 241 F.3d 1040, 1043 (8th Cir.) ("Thus, a defendant must have lost his or her civil rights pursuant to state statute in order to assert that the restoration exception [of 18 U.S.C. § 921(a)(33)(B)(ii)] is applicable."), *cert. denied,* 534 U.S. 890, 122 S.Ct. 205, 151 L.Ed.2d 146 (2001). Additionally, the court noted that, to read the statute in the manner stressed by the defendant, "would be to vitiate the statute because most misdemeanor convictions do not result in the loss of civil rights"; thus, "almost all misdemeanants would fit within the exception and the exception would swallow the rule." *Smith,* 171 F.3d at 624.

The defendant in *Smith* also argued that, because he did not literally fall within the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii), his Fifth Amendment right to equal protection was violated. *Smith,* 171 F.3d at 624. The court rejected this argument, relying on *McGrath* and the legislative history of 18 U.S.C. § 921(a)(33)(B)(ii):

Congress knew that the states had widely divergent laws regarding pardon, expungement, and restoration of civil rights. This was true not only when Congress enacted § 921(a)(20), but even more so when it enacted § 921(a)(33) in 1996, ten years after enacting the much criticized restoration exception in § 921(a)(20). *See McGrath,* 60 F.3d at 1009 (noting various courts that have criticized the disparate treatment involving the restoration exception of § 921(a)(20) based on divergent state laws). Yet, Congress continued to look to state law to define the restoration exception, noting that the exception in § 921(a)(33) was modeled after that contained in § 921(a)(20). *See* 142 Cong. Rec. S11872–01, *S11877.

Congress was cognizant of the disparity it would create. *See id.* ("Loss of these [civil] rights generally does not flow from a misdemeanor conviction, and so this language is probably irrelevant to most, if not all, of those offenders covered because of the new ban.") (statement of Sen. Lautenberg). However, Congress was concerned with domestic abuse offenders who were successful in pleading a felony charge down to a misdemeanor and thus escaping the effect of the felon-in-possession statutes. *See id.* at S11876. An earlier version of the bill did not cover attempted use of physical force or threatened use of a weapon. *See id.* at S11877. The change reflects Congress's concern that an individual in a domestic relationship who would attempt to use physical force or threaten use of a weapon was as dangerous as one who actually committed an act of physical force and similarly should not be allowed to possess a firearm. *See id.* Congress was concerned with the exact situation faced here: preventing a known (from the fact of the misdemeanor conviction) domestic abuser from later using a firearm to inflict the next bout of abuse. *See id.* at 11876.

*Smith,* 171 F.3d at 625. The *Smith* court buttressed its equal protection holding by noting that the defendant could have sought to expunge his Iowa state law conviction and could have sought to be pardoned. *Id.* at 625.

In *Hancock,* the defendant was convicted of violating 18 U.S.C. § 922(g)(9). *Hancock,* 231 F.3d at 560. On appeal, he argued, *inter alia,* that the district court erred when it denied his motion to dismiss the indictment on equal protection grounds. *Id.* at 565. According to the defendant, the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii) treated misdemeanants more harshly than it treated some felons because, in Arizona, misdemeanants do not lose their civil rights, whereas felons do lose their civil rights and may have those rights "restored." *Hancock,* 231 F.3d at 566.

The *Hancock* court rejected the defendant's argument, relying on *Smith:*

In *Smith,* the Eighth Circuit noted that Congress was aware of the discrepancies in state procedures for revoking and restoring civil rights. The court wrote that disparate treatment of some offenders was the inevitable result of Congress' decision to "look to state law to define the restoration exception." *Id.* at 625. The court further noted that restoration was only one of several procedures—pardon, expungement, and setting aside of convictions being the others—through which an offender could regain the right to possess firearms. *See id.* The court concluded that (1) it was "entirely rational" for Congress to extend the firearm ban to domestic-violence misdemeanants; (2) the discrepancy in treatment of which the defendant complained was the inevitable result of Congress' reference to state law; and (3) because the statute contained other means for misdemean-

ants to regain the right to possess firearms, it did not violate equal protection. *See id.* at 626.

The Eighth Circuit's opinion in *Smith* is persuasive. For the reasons that the *Smith* court gave, we reject Defendant's equal protection argument. Defendant had, and has, several adequate legal mechanisms at his disposal for regaining his right to possess firearms: pardon, expungement, and setting aside of convictions. "Restoration of civil rights" is not one of those mechanisms, as it might be for some felons. But that minor distinction between felons and misdemeanants is not sufficient to constitute a violation of equal protection. Even if it were sufficient, the distinction is at least minimally rational. Congress reasonably could conclude that felons who had been through a state's restoration process and had regained their civil rights (without any restriction on their possession of firearms) were more fit to own firearms than domestic-violence misdemeanants who had not had their convictions expunged or been pardoned. Reasonable people might argue whether that distinction is good public policy; but it is not irrational.

*Hancock,* 231 F.3d at 566–67.

In *Barnes,* the defendant pleaded guilty in 1997 to a District of Columbia charge of assault, 295 F.3d at 1357, which the *Barnes* court held met the definition of a MCDV under 18 U.S.C. §§ 921(a)(33)(A)(i) and (ii). *Barnes,* 295 F.3d at 1358–66. None of his civil rights were stripped away because, under the law of the District of Columbia, a misdemeanant does not lose his civil rights. *Id.* In 2000, the defendant possessed a firearm and ammunition and was charged with violating 18 U.S.C. § 922(g)(9). *Barnes,* 295 F.3d at 1357. He conditionally pleaded guilty to the 18 U.S.C. § 922(g)(9) charge, and, on appeal,

he argued that he was in a worse position than a person convicted of the same offense in a jurisdiction that authorized the loss of civil rights but also allowed their restoration. *Barnes,* 295 F.3d at 1368. According to the defendant, his equal protection rights were violated because there was no rational basis for this distinction. *Id.* The *Barnes* court rejected the defendant's argument for the foregoing reasons:

> Congress's decision to incorporate state law governing forfeiture of civil rights was rational irrespective of differences among states regarding restoration. Furthermore, the Congress provided other methods such as expungement and pardon that Barnes might use to come within the exception of section 921(a)(33). *See McGrath v. United States,* 60 F.3d 1005, 1008 (2d Cir.1995), *cert. denied,* 516 U.S. 1121, 116 S.Ct. 929, 133 L.Ed.2d 857 (1996).

*Barnes,* 295 F.3d at 1368.

We conclude that the literal application of the word "restored" as contained in 18 U.S.C. § 921(a)(33)(B)(ii) to Jennings, *i.e.,* requiring him to demonstrate that his civil rights were lost and restored, does not produce an absurd result. First, as recognized by the McGrath, Smith, Hancock, and *Barnes* courts, Congress knew when it enacted the restoration exceptions of 18 U.S.C. §§ 921(a)(20) and 921(a)(33)(B)(ii) that the several states had drastically different laws governing the restoration of civil rights and that drastically different, perhaps anomalous, results were bound to occur. *Barnes,* 295 F.3d at 1368; *Hancock,* 231 F.3d at 566–67; *Smith,* 171 F.3d at 624–25; *McGrath,* 60 F.3d at 1009. However, Congress intentionally keyed the restoration of civil rights to state law, *Smith,* 171 F.3d at 624–25; *McGrath,* 60 F.3d at 1009, so it follows that Congress consciously made the decision to accept anomalous results—like a result that fa-

vors incarcerated misdemeanants over misdemeanants that were not incarcerated. Second, Jennings has other avenues he can pursue to fall within the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii); namely, pardon and expungement. *Barnes,* 295 F.3d at 1368; *Smith,* 171 F.3d at 625. Third, to accept Jennings' position would allow the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii) to swallow the rule. *Smith,* 171 F.3d at 624. Under Jennings' formulation, all persons who are convicted of a MCDV and who do not lose their civil rights would be permitted to possess a firearm. Such a construction would allow almost all persons convicted of a MCDV to possess a firearm, thereby substantially undercutting the federal policy aimed at trying to take firearms out of the hands of persons convicted of a MCDV.

Jennings also suggests that the word "restored" is capable of another, more limited construction. Under Jennings' more limited construction, a misdemeanant who does not lose his civil rights, **because he was not incarcerated,** has had his civil rights "restored" under the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii), while a misdemeanant who does not lose his civil rights, **because he cannot under the applicable state law,** has not had his civil rights "restored." According to Jennings, such a construction would not only give meaning to 18 U.S.C. § 921(a)(33)(B)(ii)'s parenthetical language "(if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense)," *id.* § 921(a)(33)(B)(ii), but also would not put firearms in the hands of most persons convicted of a MCDV; rather, firearms would wind up only in the hands of persons convicted of a MCDV in the small minority of states that allow for the loss of civil rights while the defendant is incarcerated. We reject this argument. In our view, consistent with

the plain meaning of the word "restored" as contained in the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii), there is no logical or meaningful way to hold, on the one hand, that a person who is convicted of a MCDV in a state like South Carolina, where the state strips civil rights only while the defendant is incarcerated, can possess a firearm, and, on the other hand, hold that a person who commits a MCDV in a state that does not strip civil rights, cannot possess a firearm. Jennings' position is simply untenable because it asks this court to embrace multiple definitions of the word "restored," which we decline to do. Moreover, the distinction between misdemeanants who are not incarcerated and misdemeanants who are incarcerated is rational and does not lead to an absurd result. Congress reasonably could conclude that misdemeanants who had been through a state's restoration process and had regained their civil rights were more fit to own firearms than misdemeanants who had not lost their civil rights, had not had their convictions expunged, or had not been pardoned.

In summary, we hold that the literal application to Jennings of the word "restored" as contained in the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii) does not produce an absurd result. Because Jennings' civil rights were neither revoked nor restored, he cannot take advantage of the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii). Accordingly, the district court did not err when it refused to dismiss Jennings' indictment on the ground that he met the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii).

### III

Under 18 U.S.C. § 921(a)(33)(B)(i)(I), a person is not to be considered to have been "convicted" of a MCDV unless he was represented by counsel in the MCDV case,

or "knowingly and intelligently waived [his] right to counsel" in the MCDV case. *Id.* § 921(a)(33)(B)(i)(I). In addition, under 18 U.S.C. § 921(a)(33)(B)(i)(II), a person is not to be considered to have been "convicted" of a MCDV unless: (1) the MCDV case was prosecuted in a jurisdiction in which the person was entitled to a jury trial for the MCDV offense, *id.;* and (2) either the case was tried before a jury, *id.* § 921(a)(33)(B)(i)(II)(aa), or the person "knowingly and intelligently waived the right to a trial by jury, by guilty plea or otherwise," *id.* § 921(a)(33)(B)(i)(II)(bb). According to Jennings, his 18 U.S.C. § 922(g)(9) conviction cannot stand because he did not knowingly and intelligently waive his right to counsel and his right to a jury trial in the March 1997 CDV case.

The Sixth Amendment guarantees an accused the right to counsel in all critical stages of the prosecution and the right to a trial by jury. U.S. CONST. amend. VI. The Sixth Amendment also guarantees the right to self-representation. *Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). A criminal defendant, however, "may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution," *United States v. Mezzanatto,* 513 U.S. 196, 201, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), including the right to counsel, *Alabama v. Shelton,* 535 U.S. 654, 122 S.Ct. 1764, 1770, 152 L.Ed.2d 888 (2002) ("It is thus the controlling rule that 'absent a knowing and intelligent waiver, no person may be imprisoned for any offense ... unless he was represented by counsel at his trial.'") (quoting *Argersinger v. Hamlin,* 407 U.S. 25, 37, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972)), and the right to a jury trial, *Patton v. United States,* 281 U.S. 276, 298, 50 S.Ct. 253, 74 L.Ed. 854 (1930). To be valid, a defendant's waiver

of his right to counsel and his right to a jury trial must be knowing and intelligent. *Shelton,* 122 S.Ct. at 1770 (right to counsel); *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525 (noting that the decision to represent oneself must be knowing and intelligent); *Patton,* 281 U.S. at 309–13, 50 S.Ct. 253 (right to a jury trial).

■ We have reviewed the procedure that Judge Herbert routinely employed, in her twenty-one years as a municipal court judge, to secure a defendant's waiver of his right to counsel and his right to a jury trial and are satisfied that the procedure was followed in Jennings' March 1997 CDV case and that the procedure meets constitutional minimums.[4] Accordingly, we conclude Jennings knowingly and intelligently waived his right to counsel and his right to a jury trial in the March 1997 CDV case.[5]

### IV

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*

WIDENER, Circuit Judge, dissenting:

I respectfully dissent with respect to Section II of the majority opinion and would reverse the judgment of the district court denying the defendant's motion to dismiss the indictment on the ground that his civil rights had been restored within the meaning of 18 U.S.C. § 921(a)(33)(B)(ii).

Today, the majority decides that 18 U.S.C. § 921(a)(33)(B)(ii) should be read literally, over-literally I contend, with respect to the word "restored," and decides that the restoration exception does not apply to the defendant because his misdemeanor conviction did not result in a term of imprisonment. In making this determination, however, the majority fails to give effect to the parenthetical language in the statute. It is this language that has brought about the various views of the circuits as to Congress's intention regarding gun possession. Furthermore, it is this language that divides me from the majority's position today.

Section 921(a)(33)(B)(ii) reads, in pertinent part: "A person shall not be considered to have been convicted of such an offense ... if the conviction ... is an offense *for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense )*...." 18 U.S.C.

---

**4.** In reaching this conclusion, we assume, without deciding, that Jennings was entitled to a jury trial under South Carolina law in the March 1997 CDV case.

**5.** At oral argument, Jennings relied on *Shelton,* a case decided by the Supreme Court after the parties' briefs were filed in this case. In *Shelton,* the Supreme Court held that a sentence of actual imprisonment, or a prison sentence suspended or for which probation was granted, triggers the constitutional right to counsel. 122 S.Ct. at 1776. Consequently, only trials that end up in the actual deprivation of a person's liberty require that the accused receive " 'the guiding hand of counsel.' " *Id.* at 1767 (quoting *Argersinger,* 407 U.S. at 40, 92 S.Ct. 2006). A court that ends up fining a defendant has not placed that liberty in jeopardy and therefore is not required to appoint counsel for that defendant, even though the defendant was charged with a statutory offense for which imprisonment upon conviction was authorized. *Shelton,* 122 S.Ct. at 1769; *Scott v. Illinois,* 440 U.S. 367, 369, 373, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979). In this case, although Jennings was, per *Shelton,* entitled to counsel in the March 1997 CDV case, he knowingly and intelligently waived his right to counsel in that case. Accordingly, *Shelton* is of no help to Jennings. *Shelton,* 122 S.Ct. at 1770 ("It is thus the controlling rule that 'absent a knowing and intelligent waiver, no person may be imprisoned for any offense ... unless he was represented by counsel at his trial.' ") (quoting *Argersinger,* 407 U.S. at 37, 92 S.Ct. 2006).

§ 921(a)(33)(B)(ii) (emphasis added). I agree with the majority that by this language Congress intended to "look to state law to define the restoration exception" and was keenly aware that it would create a disparity in application of the federal law among the States. See 271–274, citing *United States v. Smith,* 171 F.3d 617, 625 (8th Cir.1999). See also *United States v. Wegrzyn,* 305 F.3d 593, 595 (6th Cir.2002) ("Congress chose to allow the states themselves to dictate the parameters of the statutory exception by recognizing the differences among state laws concerned with loss of civil rights upon conviction for certain offenses."). While it is clear that Congress elected to defer to state law, it is not patent that Congress desired to recognize both a disparity among States, and also *within* an individual State, as the majority decision would require.

Upon first glance, it might seem that the majority's reading is correct: construing the word "restored" over-literally, the defendant's civil rights were never revoked, therefore, there was nothing to restore and the restoration exception is inapplicable as it pertains to him. But this is like the offer of "more" tea to Alice who yet had had none. See *Alice in Wonderland,* Carroll, Grossett & Dunlop, 1980, p. 79. Applying this reading ignores the directive contained in the parenthetical section of the statute (*if the law of the applicable jurisdiction provides for the loss of civil rights* ), which is as much a part of the statute as any other part. In constructing this statute, Congress intended the restoration exception to differentiate between those jurisdictions in which misdemeanants may lose their civil rights and those jurisdictions that do not provide for such a loss. The majority's reading, mistakenly, I believe, assumes that Congress also intended to differentiate among individual misdemeanants and allow only some people within an applicable jurisdiction to benefit from the exception. While it does seem that Congress knew it would create anomalous results from jurisdiction to jurisdiction, I suggest that nothing in the statute indicates that Congress intended the results of today's decision. Indeed, under the majority's reading, within the State of South Carolina, a defendant, as here, would be unable to possess a firearm because his underlying crime did not warrant incarceration, but another offender in that same State whose crime justified imprisonment would qualify for the section 921(a)(33) exception. See *Wegrzyn,* 305 F.3d at 595 (noting that in Michigan someone who "committed a more egregious offense justifying incarceration would nevertheless be allowed—upon completion of a jail sentence—to possess a firearm, while another misdemeanant whose transgression did not merit such severe punishment would be treated more harshly at the conclusion of a more lenient punishment").

Not only does the majority decision require such an unreasonable result, it goes beyond what the other circuits have decided with respect to this issue. In each of the decisions on which the majority relies, the predicate convictions were not in jurisdictions that provided for the loss of civil rights for misdemeanants. See *United States v. Barnes,* 295 F.3d 1354, 1368 (D.C.Cir.2002) (noting that there is no law in the District of Columbia that forfeits the civil rights of misdemeanants, and finding no equal protection violation in those jurisdictions that do provide for loss of civil rights); *United States v. Hancock,* 231 F.3d 557, 565–66 (9th Cir.2000), *cert. denied,* 532 U.S. 989, 121 S.Ct. 1641, 149 L.Ed.2d 500 (2001) (stating that misdemeanants in Arizona do not lose their civil rights, and refusing to find it a violation of equal protection that felons who lose their civil rights could benefit from the restora-

tion exception while misdemeanants do not); *United States v. Smith,* 171 F.3d 617, 623–25 (8th Cir.1999) (noting that the federal restoration exception does not apply because Iowa law does not strip misdemeanants of their civil rights, and finding no equal protection violation in the fact that felons can qualify for an exception under 18 U.S.C. § 921(a)(20)); *McGrath v. United States,* 60 F.3d 1005 (2d Cir.1995), *cert. denied,* 516 U.S. 1121, 116 S.Ct. 929, 133 L.Ed.2d 857 (1996) (addressing the restoration exception provided in § 921(a)(20) and finding that under Vermont law felons who are convicted but never incarcerated do not lose their civil rights). But cf. *United States v. Meza–Corrales,* 183 F.3d 1116, 1129 n. 5 (9th Cir.1999) ("*McGrath* has been disagreed with by a number of other circuits, including the one upon which the authors of *McGrath* initially relied, and including the Ninth Circuit . . . .") (citations omitted). Thus, the restoration exception could not be applied to the defendants in any of those cases and the courts were not required to decide whether Congress intended anomalous results to occur within a jurisdiction. Indeed, the Eighth Circuit in *United States v. Smith* distinguished a contrary reading of the statute adopted by the First Circuit in *United States v. Indelicato,** 97 F.3d 627 (1st Cir.1996), specifically because the *Indelicato* court had an applicable state law that enabled it to fit under the federal exception. The *Smith* court reasoned that the *Indelicato* court was "indulging in a fiction" in which it was not "at liberty to engage." *Smith,* 171 F.3d at 623. But *Indelicato* concluded

that such civil rights "to the extent they were never taken away, should be treated as 'restored.'" 97 F.3d at 631.

More like our case, the Sixth Circuit decision in *United States v. Wegrzyn,* a case on facts indistinguishable from the case at hand, involved a jurisdiction in which the restoration exception was applicable because Michigan law provides for the loss of civil rights for conviction of a misdemeanor "only while confined in a correctional facility." See *Wegrzyn,* 305 F.3d at 595. Facing a similar situation to the one we have here today, the *Wegrzyn* court determined that the defendant, while never incarcerated, should benefit from the restoration exception because it gives effect to Congress's intention to let state law control. *Wegrzyn,* 305 F.3d at 595. I agree with the *Wegrzyn* court. Adopting our majority's reading of the statute actually enables federal law to create disparate results within the same State, which seems to me to cut directly against providing the States with control over the parameters of individual crimes.

Additionally, finding that the restoration exception should apply to the defendant would not, I suggest, as the majority fears, "allow the restoration exception . . . to swallow the rule." Op. at 274 (citing *Smith,* 171 F.3d at 624). The parenthetical language dictates that only a limited number of jurisdictions will be able to apply the restoration exception, thus only those limited jurisdictions will even face this problem. Deciding that those jurisdictions in which the exception applies should have consistency with respect to

---

* *Indelicato* involved an analysis of 18 U.S.C. § 921(a)(20), which does not contain the same parenthetical language of § 921(a)(33), and reads in pertinent part:

Any conviction [of any State offense classified by the laws of the State as a misdemeanor and punishable by a term of impris-

onment of two years or less] which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter. . . .
18 U.S.C. § 921(a)(20).

their own offenders does not alter Congress's ultimate intention in enacting the statute: to differentiate between those jurisdictions that strip misdemeanants of their civil rights and those that do not in order to defer to the States as to how they define the boundaries of the crime.

Unlike the Second, Eighth, Ninth, and District of Columbia Circuits, this court *must* address the parenthetical language of section 921(a)(33)(B)(ii) because South Carolina is the type of jurisdiction that Congress contemplated in enacting the statute. While it seems clear that Congress was aware (and indeed expected) that certain anomalous results that would arise from its wording of section 921(a)(33), it cannot be gleaned from the language of the statute that the exception was designed to apply as the majority has done today. Congress intended to allow the States to define the parameters of the individual crimes, and this court should allow them to do just that. The State of South Carolina has elected to strip misdemeanants of civil rights; therefore, section 921(a)(33)(B)(ii) should be applicable to misdemeanants in that jurisdiction. To allow the federal rule to then alter the law *within that jurisdiction* by providing that misdemeanants whose crimes did not warrant incarceration should not be allowed to possess guns, when those who did serve time may possess guns, removes the control from the States that Congress originally intended.

For the foregoing reasons, I would reverse the decision of the district court and hold that the restoration exception of 18 U.S.C. § 921(a)(33)(B)(ii) exempts application of 18 U.S.C. § 922(g)(1) as to the defendant.