# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-4722

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES D. LOGAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 05-CR-088-S-01—**John C. Shabaz**, *Judge.*

ARGUED JUNE 8, 2006—DECIDED JULY 6, 2006

Before EASTERBROOK, ROVNER, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* This appeal presents a single question: whether a state conviction that did not result in a deprivation of civil rights can be a predicate offense under the Armed Career Criminal Act, 18 U.S.C. §924(e)(1). That statute enhances the penalty for gun-toting felons whose prior convictions include at least three violent crimes or serious drug offenses. A conviction that a state classifies as a misdemeanor counts if the punishment can exceed two years. 18 U.S.C. §§ 921(a)(20)(B), 924(e)(2)(B). Logan has (in addition to one concededly qualifying drug felony conviction) three battery convictions that, though called misdemeanors in Wisconsin, carried maximum terms of three years' imprisonment and are treated as "violent

felonies" by §924(e). Nonetheless, Logan maintains, they should be disregarded because the last sentence of §921(a)(20) excludes from the definition of "conviction" any offense that "has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored . . . unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms."

Logan contends that a conviction that did not result in the loss of the rights to vote, hold public office, and serve on juries should be treated the same as a conviction following which those rights were terminated but later restored. This argument has the support of *United States v. Indelicato*, 97 F.3d 627 (1st Cir. 1996). The district court held, however, that an offender whose civil rights have been neither diminished nor returned is not a person who "has had civil rights restored". That conclusion, which has the support of *McGrath v. United States*, 60 F.3d 1005 (2d Cir. 1995), led to a 180-month sentence, the minimum for any armed career criminal.

Compelled to choose between the holding of *Indelicato* and that of *McGrath*, we take the second circuit's part. The reason is simple. The word "restore" means to give back something that had been taken away. As *McGrath* remarked, "the 'restoration' of a thing never lost or diminished is a definitional impossibility." 60 F.3d at 1007. Logan does not deny this, nor did the panel in *Indelicato*. That court recognized that it was going in the teeth of the statutory text but decided to do so because (a) it thought the statute silly—for why *should* someone whose civil rights were never taken away receive a higher federal sentence than a person who lost and then regained those rights?—and (b) no legislative history shows that Congress meant to distinguish between convicts who never lost civil rights and those who lost but regained them.

The second of these reasons is a makeweight. Statutes do not depend, for their force, on some statement in the

legislative history along the lines of: "We really mean it!" See, e.g., *Swain v. Pressley*, 430 U.S. 372, 378-79 (1977); *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 591-92 (1980). Today's Supreme Court uses legislative history only to resolve ambiguities in enacted texts. Even the plainest legislative history does not justify going against an unambiguous enactment. See *Arlington Central School District v. Murphy*, No. 05-18 (U.S. June 26, 2006), slip op. 11-12; *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 125 S. Ct. 2611, 2625-27 (2005). (Nor does explicit legislative history justify the creation of a legal rule on a subject about which the statute is silent. See *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446 (7th Cir. 2005).) And if legislative history directly addressing a subject does not free a court from enacted language, the *absence* of legislative history cannot do so. See *Whitfield v. United States*, 543 U.S. 209, 215-16 (2005).

As for *Indelicato*'s first reason: this is a variant on the proposition that courts read statutes to make sense rather than nonsense. Absurd possibilities are ruled out. We call *Indelicato*'s approach a variant of the anti-absurdity canon, however, because the first circuit did not mention it—and for good reason. The statute is not absurd as written. Its text parses; there is no linguistic garble. The canon is limited to solving problems in exposition, as opposed to the harshness that a well-written but poorly conceived statute may produce. See *Jaskolski v. Daniels*, 427 F.3d 456 (7th Cir. 2005). Accord, *Robbins v. Chronister*, 435 F.3d 1238 (10th Cir. 2006) (en banc). Otherwise judges would have entirely too much leeway to follow their own policy preferences by declaring that the legislative choice is harsh or jarring. See, e.g., Adrian Vermeule, *Judging Under Uncertainty* 57-59 (2006); John Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387 (2003).

The Supreme Court insists that statutes be enforced as written even when they seem mistaken or pointless—for

it is exactly then that the temptation to substitute one's judgment for the legislature's is strongest. See, e.g., *Dodd v. United States*, 545 U.S. 353 (2005) (the statute of limitations for collateral attacks on criminal convictions must be enforced as written even though time may expire before a challenge becomes possible, and even though this possibility likely resulted from legislative oversight); *Chapman v. United States*, 500 U.S. 453 (1991) (sentence for LSD must be based on the weight of the carrier medium as well as that of the drug, even though the carrier may be hundreds of times heavier and Congress may not have understood that LSD differs from other illegal drugs in this way). Laws are not "harsh" or "pointless" in any value-free framework; they seem harsh or pointless by reference to a given judge's beliefs about how things ought to work, which is why a claim of power to revise "harsh" or "pointless" laws elevates the judicial over the legislative branch and must be resisted. See *Tyler v. Cain*, 533 U.S. 656, 663 n.5 (2001).

*Indelicato* assumed that judges may correct a legislature's mistakes and oversights. It did not, however, identify any source of authority to do this—or for that matter explain why this statute is a botch. True enough, someone whose civil rights have not been revoked cannot have them restored. But restoration of civil rights is just one of three ways to erase a conviction from one's record for purposes of federal law. The other two—expungement and pardon—are as available to people who never lost their rights to vote, hold office, and serve on juries, as they are to other offenders.

Section 921(a)(20) acquired its current form in 1986 as a reaction to *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103 (1983). *Dickerson* held that federal rather than state law defines a "conviction" for purposes of 18 U.S.C. §§ 922 and 924, and that under federal law a conviction supports recidivist enhancements even after it has been expunged by the rendering court. The 1986 legislation makes the effect

of a conviction turn on state law—with the proviso that a pardon or restoration of rights removes the conviction for federal purposes, even if state law still would count it as a criminal conviction, "unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." That's a federal anti-mousetrapping rule overlain on state law; a person told that his civil rights have been restored may assume that this means *all* rights unless he is informed that the right to vote (and so on) does not imply a right to carry firearms. See *United States v. Erwin*, 902 F.2d 510, 512-13 (7th Cir. 1990). Logan has not been misled by any state act that apparently freed him from the legal consequences of his battery convictions.

When Congress replaced *Dickerson*'s uniform federal rule with a state definition of conviction, it ensured that similarly situated people would be treated differently—for states vary widely in which if any civil rights a convict loses and whether these rights are restored. Some states deprive almost all convicts of these rights but restore them automatically after a set period. See *Caron v. United States*, 524 U.S. 308, 313-14 (1998) (agreeing with appellate consensus that restoration by operation of law has the same legal effect as restoration by act of personal clemency). Others take away fewer rights and make them harder to regain. The Office of the Pardon Attorney has compiled a list of these differences that conveys the flavor, though it may be out of date. U.S. Department of Justice, *Civil disabilities of convicted felons: a state-by-state survey* (1996), available at http://www.usdoj.gov/pardon/forms/   state_survey.pdf. Vermont, for example, permits felons not only to vote from prison (they get absentee ballots) but also to hold office, but not to serve on juries; New Hampshire permits them to serve on juries but not to vote until after release (and restoration then is automatic); other states take away all three rights (plus the right to carry firearms) and don't

restore them except via executive clemency. Most states would call the batteries of which Logan was convicted felonies and deprive the offender of civil rights (for in most states the dividing line between misdemeanor and felony is a maximum term of one year's imprisonment). Wisconsin ordinarily puts the dividing line lower: misdemeanor sentences can't exceed nine months in a local jail, and any time at all in the state prison system depends on a felony conviction. Wis. Stat. §939.60. Low sentences are accompanied by a rule that misdemeanants retain the right to vote. But even a misdemeanor conviction for battery by a repeat offender can carry a three-year sentence. See Wis. Stat. §939.62, §940.19(*l*). No reading of §921(a)(20) could produce identical treatment (for purposes of federal recidivist prosecutions) of people who commit the same crimes in different states.

When the first circuit in *Indelicato* combined what it perceived as an infelicitous enactment with the absence of "We really mean it!" legislative history, it was nodding in the direction of imaginative reconstruction—the idea that a court may implement what it is sure the legislature would have done (had it faced the question explicitly) rather than what the legislature actually did. The Supreme Court has anathematized that approach as democratically illegitimate, for it sets up the judiciary as the effective lawmakers. See, e.g., *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 100-01 (1991) (calling imaginative reconstruction a "usurpation" that "profoundly mistakes [the judicial] role"); *Tafflin v. Levitt*, 493 U.S. 455, 461-62 (1990) ("Petitioners . . . insist that if Congress had considered the issue, it would have [adopted a particular rule]. This argument . . . is misplaced, for even if we could reliably discern what Congress' intent might have been had it considered the question, we are not at liberty to so speculate"). This case illustrates the practical as well as the theoretical failings in that doctrine, for *Indelicato*'s guess about what Congress "would have done, had it thought" turns out to be wrong.

Section 922(g)(9) of the criminal code makes it unlawful for anyone "who has been convicted in any court of a misdemeanor crime of domestic violence" to possess a firearm that is connected with interstate commerce. This section has a definitional provision corresponding to §921(a)(20). That provision, 18 U.S.C. §921(a)(33)(B)(ii), reads: "A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." This tracks §921(a)(20) in treating expungement, pardon, or restoration of civil rights as canceling all effect of the conviction—but it shows that the "restoration of civil rights" clause is inapplicable to one whose civil rights were never taken away. For such persons, expungement and pardon are the only ways to regain the right to possess firearms. In other words, when Congress addressed this subject directly, it supported the second circuit's conclusion in *McGrath*, not the first circuit's prediction in *Indelicato*.

Defendants have argued that §921(a)(33)(B)(ii) is itself absurd, and should not be applied as written, because (for example) the governor's pardon power in some states does not reach misdemeanor convictions. With one exception these arguments have been rejected, and courts have enforced this statute while noting, as *McGrath* had done for §921(a)(20), that the differences in state rules can lead otherwise identical offenders to be treated differently under federal law. See *United States v. Jennings*, 323 F.3d 263, 267-69 (4th Cir. 2003); *United States v. Kirchoff*, 387 F.3d 748 (8th Cir. 2004); *United States v. Smith*, 171 F.3d 617, 624-26 (8th Cir. 1999); *United States v. Hancock*, 231 F.3d

557, 566-67 (9th Cir. 2000); *United States v. Barnes*, 295 F.3d 1354, 1368 (D.C. Cir. 2002).

The outlier is *United States v. Wegrzyn*, 305 F.3d 593 (6th Cir. 2002). Persons convicted of domestic-violence misdemeanors in Michigan lose their right to vote only while incarcerated; it is restored automatically on release. Wegrzyn, who received a suspended sentence following his conviction, therefore did not lose any civil right. Without citing *McGrath*, *Indelicato*, or any of the earlier decisions under §921(a)(33)—for that matter, without parsing the statutory language—the sixth circuit declared that it would be absurd to treat more harshly (under federal law) someone who received a suspended sentence in Michigan than someone who had gone to prison there (presumably for a more serious domestic battery); *Wegrzyn* refused to apply the federal statutes as enacted. This shows that even when Congress addresses a subject as directly as possible—for §921(a)(33)(B)(ii) says point blank that people who were not deprived of their civil rights under state law differ from those whose rights were stripped and then restored—some judges still balk at applying what they find to be an unpalatable rule. *Wegrzyn*'s holding has been universally rejected by other courts that have addressed the identical question. In addition to *Jennings* and *Kirchoff*, see *United States v. Bailey*, 408 F.3d 609 (9th Cir. 2005). Just as the fourth circuit's opinion in *Jennings* disparaged *Indelicato* to the extent its approach reflected on the best understanding of §921(a)(33)(B)(ii), so we disapprove *Wegrzyn* to the extent its approach bears on the best understanding of §921(a)(20). Both of these statutes create ample potential for disparate treatment, but that's inherent in the legislative choice to make federal sentences depend on the states' different (and often internally inconsistent) approaches to revoking and restoring civil rights.

What a federal court *can* do, as a uniform matter, is count all state convictions unless the state extends a measure of

forgiveness. The last sentence of §921(a)(20) specifies how forgiveness is to be conveyed: pardon, expungement, or a restoration of civil rights. Logan's battery convictions did not qualify for the third means (though he *had* lost his civil rights in Wisconsin on account of his drug offense and never got them back) but potentially qualified for the first and second. So far as this record reveals, however, Logan never sought expungement or a pardon (and we know that, if he sought one, he did not obtain that boon). Wisconsin has neither forgiven him nor misled him about the (federal) consequences of his convictions, and as his convictions are serious enough to come within the federal definition of violent felonies they require sentencing as a recidivist under the Armed Career Criminal Act.

AFFIRMED

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*